IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. JIMENEZ-CARMENATES

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JOEL JIMENEZ-CARMENATES, APPELLANT.

Filed November 19, 2019.    No. A-19-255.

Appeal from the District Court for Hall County: PAUL W. KORSLUND, Judge. Conviction affirmed. Sentence vacated, and cause remanded for resentencing.

Mitchell C. Stehlik, of Stehlik Law Firm, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

After a bench trial in the Hall County District Court, Joel Jimenez-Carmenates was convicted of first degree forgery and sentenced to 3 years' imprisonment and 24 months' postrelease supervision. On appeal, he disputes the sufficiency of the evidence underlying his conviction, the absence of a presentence interview, and the order of postrelease supervision. We affirm his conviction. However, we vacate Jimenez-Carmenates' sentence and remand the cause for resentencing.

## BACKGROUND

In October 2015, Jimenez-Carmenates was charged in the county court for Hall County with one count of first degree forgery allegedly committed on June 6, 2015, against Union Bank & Trust (Bank). An arrest warrant was issued in October 2015, but was recalled in November

2017, at which time Jimenez-Carmenates appeared before the county court "via JABBER from Lancaster County Jail, Lincoln." Jimenez-Carmenates subsequently waived his right to a preliminary hearing and the case was bound over to the district court. On January 3, 2018, the State filed an information, charging Jimenez-Carmenates as it had in the county court. A jury trial was set for December after several continuances were granted at Jimenez-Carmenates' request.

Trial began on December 10, 2018. Jimenez-Carmenates, with the aid of an interpreter, indicated his wish to try the case to a judge rather than a jury, and he waived his right to a jury trial. Defense counsel informed the district court that Jimenez-Carmenates would consider a plea offer "over the evening." The parties were to return the next day for a bench trial. On December 11, Jimenez-Carmenates appeared with his counsel and an interpreter and trial commenced. The State's evidence consisted of testimony from individuals who performed asset protection roles at the impacted stores in 2015, testimony from an investigator, and exhibits related to the investigation. The defense's evidence consisted of Jimenez-Carmenates' own testimony.

The parties stipulated that the Bank maintained certain bank accounts (identified by the last four numbers of each account number) for four account holders (names not repeated here). We refer to the account holders as paired with his or her bank account number as Customer 1, Customer 2, Customer 3, and Customer 4. The parties further stipulated that each customer's account number was used in unauthorized transactions at a wholesale store and a department store in Grand Island, Nebraska, on June 6 and June 9 of 2015, and that the Bank covered the charges associated with those transactions. The court accepted those stipulations.

Deborah Irvine testified that she worked as an asset protection manager at the wholesale store in Grand Island in June 2015. She explained that a person has to be a member to shop there. The wholesale store has "self-checkout" registers, and Irvine believed those were available in June. When using one, an individual must first swipe his or her membership card. The receipt from the transaction reflects whose membership card was swiped. At some point, she learned of fraudulent transactions that had occurred at the store on June 6 and June 9. Irvine provided the Grand Island Police Department with the name of the membership card "that was used," receipts, and videos. The wholesale store had surveillance video focused on each register, the store exit, and outside (the parking lot). She identified exhibits 2 and 10 as containing surveillance video that she put together and provided to Investigator Daron Lindgreen. Irvine recognized exhibit 7 as "electronic journals" or receipts that asset protection managers could "pull" on a membership. She said the membership account she was looking under would have been "Joel Jimenez-Carmenates." Irvine admitted that "other people" besides a member can use that member's membership card.

Kasmira Kent said that she was working as an asset protection associate at a department store in Grand Island in June 2015. The department store had surveillance videos throughout the store, including over the registers and focused at entrances and exits, and in the parking lot. Every transaction on registers was recorded on a system, to which Kent had access to print any receipt. She could download and make copies of video footage recorded by the surveillance. She could not "edit it or anything" but could save (video footage) and put it onto a "disc" or print "still shots from the video." Kent recognized exhibit 1 as a video showing the department store that was downloaded from its system; her manager at the time would have prepared that video. Kent identified exhibit 9 as a receipt from a transaction in the department store.

Investigator Lindgreen testified that he had worked as a police officer in Grand Island for about 11½ years and had been an investigator since 2013. He said he had received various specialized training related to investigating credit card fraud and forgery. He described how bank card information can be illegally acquired and transferred onto anything with a magnetic strip. He said officers responded to the matter involving Jimenez-Carmenates' wholesale store membership account on June 13, 2015; the matter was then assigned to Investigator Lindgreen. Shortly after that, he received a report from an investigator with the Lincoln Police Department that was found to be related in that the "[Bank] had reported the compromise of several customers' card numbers in which the customers [possessed] the cards, but the card numbers had been somehow obtained and used fraudulently all across [Nebraska]," including Grand Island.

The Bank gave Investigator Lindgreen a spreadsheet showing all of the compromised accounts and the dates, locations, amounts, and approximate times of the transactions. From that, he compiled his own spreadsheet (exhibit 3) of transactions that he was concerned about with respect to Jimenez-Carmenates. Exhibit 3 shows that the stores implicated were both located on North Diers Avenue in Grand Island, and that the following transactions took place on June 6, 2015: Customer 1's account information was used at the wholesale store for transactions at 12:51 p.m., 12:52 p.m., and 12:53 p.m. for purchases of $105.38, $149.92, and $105.38, respectively; Customer 2's account information was used at the wholesale store at 1:07 p.m. and 1:08 p.m., each for purchases of $206.94; and Customer 1's account information was used at the department store at 1:42 p.m. for a $31.03 purchase. On June 9, Customer 4's account information was used at the wholesale store at 12:38 p.m. for a purchase of $110.86, and Customer 3's account information was also used there at 12:42 p.m. for a $206.94 purchase. The investigator indicated that the fraudulent transactions involved copied card information.

Investigator Lindgreen received receipts (exhibit 7) and surveillance video (exhibits 2 and 10) from Irvine of the fraudulent transactions which occurred at the wholesale store. Investigator Lindgreen was not familiar with Jimenez-Carmenates' name until he received that information; Jimenez-Carmenates' name was shown on the receipts. Investigator Lindgreen "searched" for Jimenez-Carmenates in the police department's local database and in the "Nebraska Criminal Justice Information System" (NCJIS). The local database had a photograph of Jimenez-Carmenates from "either 2014 or 2015" (exhibit 5) and NCJIS contained his Nebraska driver's license photograph (exhibit 6). To document any changes to appearance over time, Investigator Lindgreen had viewed Jimenez-Carmenates' "booking" photograph (exhibit 4) from "within the last two months." During trial, the investigator identified the defendant as Jimenez-Carmenates.

Investigator Lindgreen testified about the video evidence as it was played in court. Generally, he matched transactions listed on his spreadsheet and the receipt information for those transactions to surveillance video of those transactions.

As the surveillance video from the wholesale store (exhibit 2) played, the investigator identified Jimenez-Carmenates as the individual in a dark blue T-shirt who completed the fraudulent transactions at the wholesale store on June 6, 2015. The investigator described how the transactions were completed at 12:51 p.m., 12:52 p.m., and 12:53 p.m. Jimenez-Carmenates walked out of view of the video from 12:54 p.m. until about 1:03 p.m. Another transaction was completed at about 1:07 p.m. An individual wearing a cowboy hat and another wearing a white

baseball hat and white T-shirt appear around that time. The investigator said he had watched them (and Jimenez-Carmenates) and a man in a red hat go "to and from the same vehicle, and through all of the transactions on different dates at different locations they were all with each other at some point." After another purchase around 1:08 p.m., Jimenez-Carmenates is seen talking to the individual in a white baseball hat and white T-shirt. "[O]ne of the cards that [Jimenez-Carmenates] was able to use was then transferred to [that individual], who then uses that card as well to complete a transaction." The investigator indicated that at about 1:09 p.m., Jimenez-Carmenates is seen leaving the wholesale store holding some of the same items observed at the registers. The investigator said a video showed the four suspects getting into the same vehicle, which departed at 1:26 p.m.

Investigator Lindgreen had also received documentation (exhibit 9) and surveillance video (exhibit 1) from Kent's manager at the department store. Referring to the surveillance video dated June 6, 2015, Investigator Lindgreen identified the individual who came into view of a register at about 1:42 p.m. as Jimenez-Carmenates. His identification was premised on the department store video taking place about 30 minutes after the wholesale store video and Customer 1's card being used at the department store after being used at the wholesale store "30 minutes prior." Also, the investigator said the "clothing was an exact match" of "a dark blue T-shirt, jean shorts, [and] sandals." He believed the individuals who were with Jimenez-Carmenates at the wholesale store were also with him at the department store.

According to Investigator Lindgreen, surveillance video from the wholesale store (exhibit 10) contained the fraudulent transactions at the wholesale store on June 9, 2015. While exhibit 10 was published, Investigator Lindgreen identified an individual as Jimenez-Carmenates. The investigator described viewing transactions made by Jimenez-Carmenates that corresponded to those listed on the investigator's spreadsheet of transactions (exhibit 3) as occurring at 12:38 p.m. and 12:42 p.m. at the wholesale store on June 9. The investigator said exhibit 8 was a photograph (retrieved from surveillance video) of Jimenez-Carmenates exiting the wholesale store on June 9.

Investigator Lindgreen said the total loss to the Bank associated with transactions involving Jimenez-Carmenates was over $20,000, but the total found attributable to Jimenez-Carmenates in Grand Island was $1,123.39. Investigator Lindgreen indicated that there were other transactions conducted by the other individuals who accompanied Jimenez-Carmenates. The investigator identified by name three other suspects, two of whom made purchases using a wholesale store membership account listed under Jimenez-Carmenates' name; several of those purchases were done at about the same time as the transactions discussed during trial. During the course of his investigation of Jimenez-Carmenates, Investigator Lindgreen was investigating two of the other three suspects he had identified and found they had visited and/or previously lived in Las Vegas, Nevada. At the time of his investigation, he did not recall any Las Vegas address for Jimenez-Carmenates; he said Jimenez-Carmenates' Nebraska driver's license reflected an address in "this area" around the time of the alleged offense.

The State rested after the investigator's testimony. The defense moved for a directed verdict or a dismissal, but the motion was overruled.

Jimenez-Carmenates testified that in 2015, he had a wholesale store membership with his former wife whose name was also on the account; we note the wholesale store receipts in evidence did not display her name. He said he lived in Grand Island from 2009 to 2014, then in Las Vegas

in 2015. He denied ever purchasing a fraudulent gift card or using someone else's credit or debit card information to make purchases. He denied recognizing anyone depicted in the videos in exhibits 1, 2, or 10 or knowing anyone by the name of the three individuals who Investigator Lindgreen identified as the other suspects. Jimenez-Carmenates said he typically shopped with his wife or other family members when he shopped at the wholesale or department store, where he had gone "[t]housands of times" when he lived in Grand Island. Regarding his preferred type of register, he was "really, really ignorant" when it came to "machinery or anything like that." His wife "took care of all purchases." He disputed Investigator Lindgreen's identification of a person in the videos as Jimenez-Carmenates, saying he did not believe it was him. He said "I don't know. It didn't seem like they had the video on the face. There was a head with a face on it. No, I don't believe it was me. It's not me. [I]f he identified me because of height and weight, I don't know." Jimenez-Carmenates admitted he had been convicted of a felony offense in Lincoln, Nebraska, but said he was appealing it. After Jimenez-Carmenates testified, the defense rested.

The district court found Jimenez-Carmenates guilty beyond a reasonable doubt of first degree forgery. The district court ordered a presentence investigation and advised Jimenez-Carmenates that he had to cooperate with the "Probation Department" to complete the presentence investigation report (PSR) by keeping all scheduled appointments as a condition of his bond.

On March 7, 2019, the district court sentenced Jimenez-Carmenates to 3 years' imprisonment with credit for 58 days served, followed by 24 months' postrelease supervision. His sentence was to run consecutive to "the sentences" he was already serving under "the order of the Lancaster County District Court."

Jimenez-Carmenates appeals.

## ASSIGNMENTS OF ERROR

Jimenez-Carmenates claims, restated and reordered, that the district court (1) erred by finding him guilty of first degree forgery, (2) abused its discretion in proceeding to sentence him without providing him the opportunity to be interviewed as part of a presentence investigation, and (3) erred in sentencing him to serve a term of postrelease supervision.

## STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019).

Plain error may be found on appeal when an error, plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Kantaras*, 294 Neb. 960, 885 N.W.2d 558 (2016).

ANALYSIS

SUFFICIENCY OF EVIDENCE

Jimenez-Carmenates challenges the sufficiency of the evidence underlying his conviction. He was convicted of first degree forgery under Neb. Rev. Stat. § 28-602(1) (Reissue 2008), which provides that a person is guilty of the offense if,

> with intent to deceive or harm, he falsely makes, completes, endorses, alters, or utters a written instrument which is or purports to be, or which is calculated to become or to represent if completed:
>
> (a) Part of an issue of money, stamps, securities, or other valuable instruments issued by a government or governmental agency; or
>
> (b) Part of an issue of stock, bonds, bank notes, or other instruments representing interests in or claims against a corporate or other organization or its property.

A written instrument means any paper, document, or other instrument containing written or printed matter used for purposes of reciting, embodying, conveying, or recording information, and any money, credit card, token, stamp, seal, badge, trademark, or any evidence or symbol of value, right, privilege, or identification which is capable of being used to the advantage or disadvantage of some person. Neb. Rev. Stat. § 28-601(1) (Reissue 2008). The term "utter," as used in § 28-602(1), means "to issue, authenticate, transfer, sell, transmit, present, use, pass, or deliver, or to attempt or cause such uttering." § 28-601(9).

The evidence showed, and there is no dispute on appeal, that an individual falsely uttered written instruments (bank account card information) belonging to Customer 1, Customer 2, Customer 3, and Customer 4 in unauthorized transactions that took place at the wholesale and department stores on June 6 and 9, 2015. The parties stipulated that the Bank covered the charges associated with those transactions. The intent to deceive or harm of the individual who falsely uttered the bank account card information can reasonably be inferred in consideration of the direct evidence capturing those transactions on surveillance video and matching receipts, the parties' stipulations, and testimony regarding the investigation. See *State v. Tucker*, 17 Neb. App. 487, 764 N.W.2d 137 (2009) (whether defendant possesses requisite state of mind is question of fact and may be proven by circumstantial evidence). The evidence showed that the offense of § 28-602(1)(b) had been committed by the individual seen completing the transactions at issue in the surveillance videos.

The only dispute on appeal is whether Jimenez-Carmenates was the individual who committed the first degree forgery. Jimenez-Carmenates takes issue with the manner in which the identification was made. He argues that there were "no eyewitnesses [to] the alleged crimes" and that the investigator said that "the person he identified as [Jimenez-Carmenates] in the [c]ourtroom" looked substantially different or had changed significantly from the person he identified in the videos. Brief for appellant at 16. The "videos depicted a person that had what appeared to be a bald spot on his head." *Id.* Jimenez-Carmenates points to his testimony that he had never been balding and had always had hair.

Reviewing the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence to support the conviction. The video evidence shows and the investigator

concluded that the clothing of the suspect on June 6, 2015, at the wholesale and department stores were an "exact match." The wholesale store receipts (exhibit 7) display Jimenez-Carmenates' name, indicating the transactions were made on his membership account. Seeing that name on those receipts reasonably led Investigator Lindgreen to search for Jimenez-Carmenates in the police department's local database and NCJIS to determine if Jimenez-Carmenates was the perpetrator who was visible in surveillance video and, initially referring to two photographs (exhibits 5 and 6, one of which was said to be from 2014 or 2015), identified Jimenez-Carmenates as such. Jimenez-Carmenates admitted that exhibits 5 and 6 were photographs of him. He was also identified as the suspect on video at the wholesale store on June 9, 2015. Besides the photograph to video comparisons, the investigator identified other individuals as suspects in the overall fraud scheme who accompanied Jimenez-Carmenates to the stores on June 6 and June 9; they were visible in the videos at the times indicated by the investigator. Having compared the characteristics of the suspect as seen in the videos (containing overhead and frontal vantage points) and photographs (exhibits 5 and 6) of Jimenez-Carmenates, we find a rational trier of fact could have concluded the suspect was Jimenez-Carmenates.

As Jimenez-Carmenates points out, during trial the investigator noted Jimenez-Carmenates had presently lost a "substantial" amount of weight, had a hairline that apparently "receded somewhat," and had grown a beard (Jimenez-Carmenates also admitted exhibit 4 was a photograph of him; he has a beard in that photograph, which was said to be from within the 2 months before trial). Even though his appearance may have changed from the time of the offense (2015) to the time of trial (2018), the evidence supports that he has always had short hair on his head. He appears with short hair in exhibit 5 and even shorter hair in exhibit 6. He agreed that exhibit 6 showed that he had (as stated by the prosecutor) "pretty short, buzzed hair." The videos show Jimenez-Carmenates with short hair; in certain footage positioned from above the registers, the hair at the center of the top of his head appears to either be thinning or had been cut so short that the skin on his head was more visible there compared to the rest of his head. Regardless, he does not appear bald in the videos or in any of the photographs. Moreover, other aspects of Jimenez-Carmenates' person were visible for comparison.

After Jimenez-Carmenates was pronounced guilty of first degree forgery, the district court stated that it believed that it was the "same person" in the wholesale and department stores. The district court noted its finding that the photograph of exhibit 8 showed the "same person" that was displayed in the photographs of exhibits 4, 5, and 6. Further, the district court found that the videos of exhibits 1, 2, and 10 corresponded with the "spreadsheet synopsis" of exhibit 3, the receipts in exhibits 7 and 9, and the "[wholesale store] membership." In a bench trial of a criminal case, the trial court's findings have the effect of a verdict and will not be set aside unless clearly erroneous. *State v. Muro*, 269 Neb. 703, 695 N.W.2d 425 (2005). The district court's determination as to the identification of Jimenez-Carmenates as the offender was not clearly erroneous, as we have previously concluded that a rational trier of fact could reach that conclusion. Therefore, Jimenez-Carmenates' insufficiency of the evidence claim fails.

PRESENTENCE INTERVIEW

Jimenez-Carmenates claims that the district court abused its discretion by "sentencing him without affording him the opportunity to be interviewed for a presentence investigation." Brief for

appellant at 12. During the sentencing hearing, the district court stated it had received and reviewed the PSR. The court asked if defense counsel had any requested additions or corrections to the PSR. Defense counsel responded "[n]o," but noted that Jimenez-Carmenates was "not interviewed for it, but the statement and the letter attached to the [PSR] regarding his sentences from Lancaster County, [Nebraska]," case "CR 17-1251," were "correct." That information was not phrased as an objection or an argument as to a reason why sentencing could not continue. The hearing proceeded with argument as to an appropriate sentence for Jimenez-Carmenates. Defense counsel waived the matter of sentencing without a current presentence interview having been done. See *State v. Pereira*, 284 Neb. 982, 824 N.W.2d 706 (2013) (generally, where no objection is made at sentencing hearing when defendant is provided opportunity to do so, any claimed error is waived and is not preserved for appellate review).

Nonetheless, we will review Jimenez-Carmenates' claim for plain error. An appellate court always reserves the right to note plain error that was not complained of at trial or on appeal. *State v. Kantaras*, 294 Neb. 960, 885 N.W.2d 558 (2016). Plain error may be found on appeal when an error, plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id.*

A presentence investigation and report "shall include, when available, an analysis of the circumstances attending the commission of the crime, the offender's history of delinquency or criminality, physical and mental condition, family situation and background, economic status, education, occupation, and personal habits, and any other matters that the probation officer deems relevant or the court directs to be included." Neb. Rev. Stat. § 29-2261(3) (Cum. Supp. 2018). The investigation shall also include any written statements submitted to the county attorney or probation officer by a victim. *Id.*

We pause to note that Jimenez-Carmenates' Lancaster County convictions, mentioned by defense counsel during the sentencing hearing, were appealed to this court. See *State v. Carmenates*, No. A-18-350, 2019 WL 1130376 (Neb. App. Mar. 12, 2019) (selected for posting to court website) (December 2017 Lancaster County convictions for theft by deception and criminal possession of four or more financial transaction devices affirmed).

The PSR for this case showed some of Jimenez-Carmenates' personal identification information (e.g., his age, status as a father, education history, and employment status), his extensive criminal history (updated), circumstances of the present offense, and a description of a statement from the Bank. Attached to the PSR were court filings, offense reports, the Bank's letter, a 2018 "Classification Study" from the Nebraska Department of Correctional Services, and Jimenez-Carmenates' prior PSR from his 2017 convictions out of Lancaster County (Lancaster County PSR) that was completed in February 2018, and was based in part on an interview of Jimenez-Carmenates on January 11. The Lancaster County PSR covers in great detail all the information required to be included in a PSR pursuant to § 29-2261(3), except for any victim statement that may have been received. The Classification Study has information about the offenses out of Lancaster County for which Jimenez-Carmenates was incarcerated and his education and employment history, institutional adjustment, mental health history, and personal risk factors at the initial classification.

Jimenez-Carmenates argues that he was not able to provide updated information for most factors listed under § 29-2261(3), but the PSR along with its attachments contain all of the information required by § 29-2261(3). We note that his conviction here clearly occurred out of the same criminal scheme as his convictions at issue in the Lancaster County PSR, his Lancaster County PSR interview was relatively close in time to his sentencing in Hall County, Nebraska, and plenty of updated information is provided elsewhere in or attached to the present PSR.

Jimenez-Carmenates does not assert specifically what he would have said in an interview other than he could have said "whether he felt remorse for the convictions and the effect that the convictions have had on him and his family." Brief for appellant at 14. As related to his 2017 convictions, the Lancaster County PSR states he "denied any knowledge of or participation in [the] crime" and the Classification Study notes he "tends to blame his codefendants for involvement in fraudulent financial activities." During the sentencing hearing in the Hall County District Court, defense counsel argued that it was unknown "if there was any remorse as it relates to the Hall County case" and that the "series of events has been devastating to [Jimenez-Carmenates] and his family [and devastating] on a financial basis as well." Jimenez-Carmenates had the chance to speak personally to the court but declined, saying "I have nothing"; if he was remorseful, he did not express it (and does not do so on appeal). Regardless, he does not contend that anything he would have reported about himself in an interview would have made any difference to the sentence imposed. We find no plain error related to this assigned error.

POSTRELEASE SUPERVISION

On appeal, the parties agree that including a term of postrelease supervision in Jimenez-Carmenates' sentence was plain error. We agree. It appears the sentencing court may have relied upon the sentencing ranges set forth in the PSR when determining a sentence for Jimenez-Carmenates. Unfortunately, the PSR incorrectly indicated that the penalty for a Class III felony in this case was up to 4 years' imprisonment and 2 years' postrelease supervision, a $25,000 fine, or both. The PSR also indicated that at least 9 months' postrelease supervision was required if imprisonment was imposed. The district court proceeded to include 24 months' postrelease supervision in Jimenez-Carmenates' sentence. Neither party objected at sentencing. The problem with the sentencing range provided in the PSR, along with the postrelease supervision provision imposed, is that the offense underlying Jimenez-Carmenates' conviction took place in June 2015 which preceded the August 2015 effective date for certain statutory changes to sentencing ranges and the imposition of postrelease supervision.

A sentence that is contrary to the court's statutory authority is an appropriate matter for plain error review. *State v. Kantaras, supra*. The power to define criminal conduct and fix its punishment is vested in the legislative branch, whereas the imposition of a sentence within these legislative limits is a judicial function. See *id.* Accordingly, a sentence is illegal when it is not authorized by the judgment of conviction or when it is greater or less than the permissible statutory penalty for the crime. *Id.*

Jimenez-Carmenates was convicted of first degree forgery for criminal conduct which took place in June 2015. First degree forgery is a Class III felony under § 28-602(2). As controlling at the time of Jimenez-Carmenates' offense, Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2014) mandated that a Class III felony was punishable by 1 to 20 years' imprisonment, a $25,000 fine,

or both. No term of postrelease supervision was statutorily authorized as part of a sentence for a Class III felony for an offense committed in June 2015. See *id.*

The PSR erroneously indicated a version of § 28-105(1) which was revised by the Nebraska Legislature in 2015. See 2015 Neb. Laws, L.B. 605. Under Neb. Rev. Stat. § 28-105(1) (Supp. 2015), a Class III felony became punishable by up to 4 years' imprisonment and 2 years' postrelease supervision, a $25,000 fine, or both (minimum of 9 months' postrelease supervision required if imprisonment imposed). However, that change to the penalty for a Class III felony did "not apply to any offense committed prior to August 30, 2015." § 28-105(7). Therefore, postrelease supervision was not applicable to Jimenez-Carmenates since he committed his first degree forgery offense in June 2015.

Inclusion of a term of postrelease supervision in Jimenez-Carmenates' sentence was plain error as it was contrary to the court's statutory authority. See *State v. Kantaras, supra*. Accordingly, we vacate the entirety of Jimenez-Carmenates' sentence and remand for resentencing on his conviction under the version of the applicable sentencing statutes in effect at the time Jimenez-Carmenates committed his offense in June 2015.

SENTENCING CREDIT

The State also suggests the district court committed plain error when it granted Jimenez-Carmenates credit for 58 days served. We agree. Credit for time served is not discretionary, but instead, based on the record, an absolute and objective number. *State v. Bree*, 285 Neb. 520, 827 N.W.2d 497 (2013). Whether a defendant is entitled to credit for time served and in what amount are questions of law. *State v. Wills*, 285 Neb. 260, 826 N.W.2d 581 (2013).

Neb. Rev. Stat. § 83-1,106 (Reissue 2014) provides that "[c]redit against the maximum term and any minimum term shall be given to an offender for time spent in custody as a result of the criminal charge for which a prison sentence is imposed or as a result of the conduct on which such a charge is based." However, "a convicted felon, incarcerated for one offense and awaiting trial on an unrelated offense, receives no credit, pursuant to § 83-1,106(1), for time served while awaiting trial and sentencing on the unrelated offense." *State v. McLeaney*, 6 Neb. App. 807, 810, 578 N.W.2d 68, 70 (1998). See, also, *State v. Baker*, 250 Neb. 896, 553 N.W.2d 464 (1996) (defendant was not in jail awaiting trial and sentencing for pending case; rather, defendant was in jail serving sentence for separate offense, thus defendant was not entitled to credit in pending case).

The State correctly points out that the Lancaster County PSR reflects that Jimenez-Carmenates was in custody in Nevada from July 26 to August 15, 2017 (21 days), before being extradited to Nebraska where he remained in custody from August 16 to February 19, 2018 (188 days). Therefore, from July 26, 2017, through February 19, 2018, Jimenez-Carmenates was in custodial detention for a total of 209 days. On February 20, 2018, Jimenez-Carmenates was sentenced in the Lancaster County District Court to a total of 6 to 10 years' imprisonment on his two convictions with credit for 209 days served. Therefore, Jimenez-Carmenates was given credit in the Lancaster County case for all time served up through February 19, 2018.

The PSR for the Hall County conviction indicated that Jimenez-Carmenates was in jail from January 5 through January 10, 2018 (6 days). Because that time overlapped with time for which he already received credit in the Lancaster County case, the Hall County District Court could not again credit that time to him. See, *State v. Custer*, 292 Neb. 88, 871 N.W.2d 243 (2015)

(although under Neb. Rev. Stat. § 83-1,106, offender shall be given credit for time served as result of charges that led to sentences, presentence credit is applied only once); *State v. Williams*, 282 Neb. 182, 802 N.W.2d 421 (2011) (offender who receives consecutive sentences is entitled to credit against only first sentence imposed).

The State further asserts that the "remaining 52 days of credit awarded in the [present] case were for dates following Jimenez-Carmenates' sentencing in Lancaster County, which overlap the time during which he was serving his 6 to 10 year prison sentence for Lancaster County." Brief for appellee at 17. The PSR shows that Jimenez-Carmenates was in jail during various time periods between February 23 and December 12, 2018 (52 days total). However, the PSR also indicates that Jimenez-Carmenates was already serving his sentences for his Lancaster County convictions during the 52 days noted. As previously noted, a convicted felon who is incarcerated for one offense and awaiting trial on an unrelated offense, receives no credit for time served while awaiting trial and sentencing on the unrelated offense. See *State v. McLeaney, supra*. Section 83-1,106(1) provides for credit for the time the offender is forced to be in custody as a result of the criminal charge for which sentence is imposed; credit for presentence incarceration need not be given to an individual incarcerated by another jurisdiction for an unrelated offense. See *State v. McLeaney, supra*.

We conclude that based on the record before this court, no presentence credit for time served is available for Jimenez-Carmenates for his Hall County sentence.

CONCLUSION

We affirm Jimenez-Carmenates' conviction and find no plain error in his PSR being completed without an updated presentence interview. However, we vacate his entire sentence and remand the cause for resentencing in accordance with this opinion.

CONVICTION AFFIRMED. SENTENCE VACATED, AND CAUSE REMANDED FOR RESENTENCING.